## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

|  |  |  |
|---|---|---|
| STEVEN A. MONOSSON and MARK WHITING, on Behalf of Themselves and Similarly Situated Unitholders of TEEKAY OFFSHORE PARTNERS L.P., | ) ) ) ) ) | C.A. No. |
| Plaintiffs, | ) ) | |
| v. | ) ) | **JURY TRIAL DEMANDED** |
| TEEKAY OFFSHORE PARTNERS L.P., TEEKAY OFFSHORE GP L.L.C., BROOKFIELD ASSET MANAGEMENT, INC., BROOKFIELD BUSINESS PARTNERS, L.P., WILLIAM UTT, IAN CRAIG, KENNETH HVID, CRAIG LAURIE, DAVID LEMMON, JIM REID, DENIS TURCOTTE, GREG MORRISON, WILLIAM TRANSIER, WALTER WEATHERS, INGVILD SAETHER, JAN RUNE STEINSLAND, and CYRUS MADON, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) | |
| Defendants. | ) ) | |

## VERIFIED CLASS ACTION COMPLAINT FOR
## BREACH OF FIDUCIARY DUTIES AND BREACH OF CONTRACT

Plaintiffs Steven A. Monosson and Mark Whiting ("Plaintiffs" or "Unitholders"), by and through their undersigned counsel, for their complaint against Teekay Offshore Partners L.P. ("Teekay"), Teekay Offshore GP L.L.C. ("Teekay GP" or the "General Partner," and together with Teekay, the "Teekay Defendants"), Brookfield Asset Management, Inc. ("BAM"), Brookfield Business Partners L.P. ("BBU," and together with BAM and their affiliates, "Brookfield"), William Utt, Ian Craig, Kenneth Hvid, Craig Laurie, David Lemmon, Jim Reid, Denis Turcotte, Greg Morrison, William Transier, Walter Weathers, Ingvild Saether, Jan Rune Steinsland, and Cyrus Madon (the "Individual Defendants," and collectively with the Teekay Defendants and

Brookfield, "Defendants"), allege upon personal knowledge, as to themselves, and upon information and belief, as otherwise, as follows:

## NATURE OF THE ACTION

1.      Teekay is a leading services provider in the offshore petroleum industry.  Its business has strong fundamentals because it benefits from high barriers to entry, stable relationships with large producers, and a stable source of revenue through long-term contracts. However, due to mismanagement and poor capital allocations, it faced a cash crunch and a steep decline in market capitalization between 2014 and 2016.

2.      In June 2017, Brookfield, an asset management company with experience in real estate and natural resources, rode to Teekay's rescue with a white-knight offer that infused Teekay with over $600 million in cash; Brookfield's investment eventually grew to over $1.5 billion, and the cash infusion allowed Teekay to pay off debt, retire preferred units and therefore save on dividend payments, and purchase assets that would promise to lead to growth.

3.      While Brookfield's investments ostensibly were to aid in Teekay's growth, they also served to keep Teekay's debt level high and dividend payouts to common units low.  The short-term pain has depressed Teekay's common unit trading price.  Brookfield justified its trading-price-depressing actions as investments that would pay off in the long term, and indeed, some of those investments – such as the financing of new shuttle tankers – were meant to pay off by late 2019 and 2020.  Despite Teekay's issuance of low dividends for its common units, Teekay's strong business fundamentals and Brookfield's seeming support led other large investors, such as Plaintiffs and several institutions, to remained invested because of the evidence that Teekay's trading price was vastly undervalued compared to its fundamentals, and that the common units

were on the verge of shooting up in value as Teekay's capital-intensive investments were on the verge of paying off.

4.     But in the last few months, Brookfield finally revealed that, rather than being a white knight, it is a Trojan horse that deliberately depressed Teekay's common unit trading price so that Brookfield could snap up the units for cheap and capture all of Teekay's upside for itself, while squeezing out non-affiliated common unitholders.  On May 17, 2019, Brookfield made an offer to Teekay's Conflicts Committee to buy out all the Limited Partners' common units at a price even lower than Teekay's already depressed trading price.

5.     Brookfield knows that it has nothing to lose by this strategy because it is likely to gain approval by the Conflicts Committee, which is itself conflicted, and once it has this approval it has multiple ways to push through a buyout that non-Brookfield unitholders are powerless to stop.  Brookfield did not choose to subject its offer to a vote by Teekay's non-affiliated unitholders, who hold a minority of the Limited Partnership units, because Brookfield knew that its absurdly low offer would be rejected if non-affiliated unitholders were given a choice.

6.     In any event, because Brookfield has already caused Teekay to undertake numerous actions that led to the common unit trading price being depressed, Brookfield can simply buy the common units at a low price on the open market if its low-ball offer is rejected.  Brookfield has a call right to buy out all non-Brookfield common units once it holds 80% of Teekay's common units.  Brookfield already holds 73% of the common units, so it would only need to purchase 7% of the common units on the open market to exercise its call right.

7.     But what Brookfield has done, and what it has caused the other Defendants to do, violates Defendants' contractual fiduciary duties under the respective partnership agreements.  The General Partnership Agreement specifies that the directors of the General Partner owe fiduciary

duties to the partnership.  The Limited Partnership Agreement specifies that the General Partner has to act in "good faith," which means it has to take actions it "reasonably believe[s]" to be in the "best interests" of the Partnership, which is a contractual fiduciary duty akin to the entire fairness standard in Delaware corporate law.  Brookfield has the same fiduciary duties as the General Partner because it controls and directs the actions of the General Partner.

8.      Plaintiffs seek to prevent Brookfield from stealing their and other Teekay common unitholders' investments through Brookfield and Defendants' violation of fiduciary duties. Plaintiffs hereby bring this action to seek an injunction against Brookfield's proposed transaction, as well as damages that have resulted and will result from Defendants' fiduciary duty breaches.

## PARTIES

9.      Plaintiff Steven A. Monosson has been a continuous unitholder of Teekay since October 27, 2008, and holds or controls 790,640 common units.  He is a resident of the state of California.

10.      Plaintiff Mark Whiting has been a continuous unitholder of Teekay since September 29, 2015, and holds or controls 1,272,000 common units.  He is a resident of the state of California.

11.      Defendant William Utt ("Utt") has been the Chair of the Board of Directors of the General Partner (the "Board") since 2017.  He also chairs the Corporate Governance Committee.

12.      Defendant Ian Craig ("Craig") has served as a member of the Board since 2017. He is the Chair of the Conflicts Committee and a member of the Audit Committee.

13.      Defendant Kenneth Hvid ("Hvid") has served as a member of the Board since 2011, and has served as President and CEO of Teekay Corporation (the "Corporation") since 2017.

14.     Defendant Craig Laurie ("Laurie") has served as a member of the Board since 2018 and sits on the Compensation and Corporate Governance Committees; he has been associated with Brookfield since 1997, and is a managing partner of BAM's Private Equity Group.  He is a member of the Corporate Governance Committee.

15.     Defendant David Lemmon ("Lemmon") has served on the Board since 2006, and is a member of the Audit, Compensation, and Conflicts Committee.

16.     Defendant Jim Reid ("Reid") has served on the Board since 2017; he is a managing partner and Chief Investment Officer of BAM's Private Equity Group and has otherwise been associated with Brookfield since at least 2003.

17.     Defendant Denis Turcotte ("Turcotte") has served on the Board since 2018.  He chairs the Compensation Committee and sits on the Corporate Governance Committee.  He is a managing partner in BAM's Private Equity Group and has been otherwise associated with Brookfield since at least 2006.  He currently also serves as Chairman of Westinghouse Electric Company ("Westinghouse"), a Brookfield affiliate.

18.     Defendant Greg Morrison ("Morrison") has been a member of the Board since July 8, 2019, and sits on various other Brookfield subsidiary or affiliate boards.  He is currently a director of, and until October 2018 was the CEO of, Trisura Group, which was spun off from BAM in June 2017.

19.     Defendant William Transier ("Transier") has been a member of the Board since March 2019; he participated in the restructuring of Westinghouse, a Brookfield affiliate, at the behest of Brookfield.  Transier also serves on the Westinghouse board, which Defendant Turcotte chairs.  Transier was formerly a member of the Conflicts Committee and currently is the chair of the Audit Committee.

20.     Defendant Walter Weathers ("Weathers") served as a member of the Board from September 2017 to July 8, 2019, and he is a senior vice president in BAM.

21.     Defendant Ingvild Saether ("Saether") is Teekay's President and CEO.

22.     Defendant Jan Rune Steinsland ("Steinsland") is Teekay's Chief Financial Officer.

23.     Defendant Cyrus Madon ("Madon") is the CEO of BBU.

24.     Defendant Teekay is a leading international midstream services provider to the offshore oil production industry.  It operates shuttle tankers, loading ships, and other types of oil tankers and other vessels.  It relies on medium to long-term charter contracts to maintain and grow its business.  Teekay is a limited partnership organized under the laws of the Marshall Islands, with its operational headquarters in Bermuda.  Teekay is traded on the New York Stock Exchange under the ticker symbols TOO, TOO PR A, and TOO PR B.

25.     Defendant Teekay GP is the general partner of Teekay.  It is a Marshall Islands limited liability company that is 100% owned by Brookfield TK TOGP, L.P., a Bermuda limited partnership, which is wholly owned by Brookfield.

26.     Defendant BAM is an alternative asset management company with over $300 billion of assets under management.  It is headquartered in Toronto and incorporated in Canada. It has corporate offices in New York City and its stock trades on the NYSE under the ticker BAM.

27.     Defendant BBU is a limited partnership spun off from BAM in 2016; it is headquartered in Bermuda.  It operates BAM's international businesses.  It trades on the NYSE under ticker symbol BBU.  BAM holds 100% of the voting power of BBU.

## JURISDICTION AND VENUE

28.     Plaintiffs Steven A. Monosson and Mark Whiting are both residents of California. Defendant Teekay Offshore Partners L.P. is incorporated in the Marshall Islands and

headquartered in Bermuda. Defendant BBU is incorporated and headquartered in Canada. The amount in controversy is over $5,000,000. Because at least one named plaintiff and one named defendant are citizens of different states and the amount in controversy is over $5,000,000, this Court has jurisdiction under the Class Action Fairness Act. 28 U.S.C. §1332(d).

29.     Each Defendant has consented to personal jurisdiction because each has caused the Partnership to engage in acts that affect the price of the Teekay common units, which exclusively trade on the NYSE, resulting in harm to a market and investors located in New York. Thus, each Defendant is subject to New York's long-arm jurisdiction because he, she, or it transacts business in New York and committed torts within the state and should reasonably expect to be haled into court in New York.

30.     Venue is proper in this district under 28 U.S.C. §1391 because the publicly traded units that are the subject of Plaintiffs' claims trade exclusively in this district and the Defendants directed their activities toward this district. Thus, the events giving rise to the claims have occurred in substantial part in this district.

31.     Subject matter jurisdiction, personal jurisdiction, and venue are also proper in this Court because Defendants have consented to jurisdiction here under the forum selection clause in the Second Amended and Restated Limited Liability Company Agreement ("GP Agreement"), which states:

> Any and all suits, legal actions or proceedings arising out of this agreement (including against any director or officer of the company) shall to the fullest extent permitted by law be brought solely in the Supreme Court of the State of New York, New York County, or the Southern District of New York and each member hereby to the fullest extent permitted by law irrevocably and unconditionally submits to and accepts the exclusive jurisdiction of such courts[.]

*Id*. at 13.16. [Emphasis removed.]

## DUTIES OF THE GENERAL PARTNER AND RELEVANT STANDARDS

32.     The Marshall Islands Limited Partnership Act (the "Act") allows for limited liability partnerships to restrict and modify fiduciary duties, but does not authorize a company to eliminate those duties entirely.

33.     The Form 20-F annual report (the "20-F") filed with the SEC also acknowledges that Teekay's "general partner has a fiduciary duty to manage us in  a manner beneficial to us and our unitholders[.]"  The 20-F also acknowledges that potential conflicts of interest may arise because "certain directors and an officer of our general partner are directors or officers of affiliates of our general partner" and as a result "our general partner may favor its own interests and the interests of its affiliates over the interests of our unitholders."

34.     The 20-F also states that while the Limited Partnership is governed by a partnership agreement under the Act, the construction of the law is meant to be "uniform with the laws of the State of Delaware."

35.     Teekay GP is the general partner of Teekay. The General Partner is governed by the GP Agreement.  It specifies that the Directors of the General Partner board "shall owe to the Company and, through the Company, to the Members duties of loyalty and care of the type owed by the directors of a corporation to such corporation under the laws of the Republic of the Marshall Islands . . . .  The officers, in the performance of their duties as such, shall owe to the Members duties of loyalty and care of the type owed by the officers of a corporation to such corporation under the laws of the Republic of the Marshall Islands."  [Emphasis removed.]  The agreement spells out a limited exception to such duties, in that the officers and directors are not obligated to give the General Partner a right of first refusal with respect to corporate opportunities.

36.     Moreover, the General Partner owes fiduciary duties to the Limited Partners, as specified in the Sixth Amended and Restated Agreement of Limited Partnership of Teekay Offshore Partners LP (the "LP Agreement").  This is consistent with the default standard under Delaware law, where a general partner of a limited partnership owes fiduciary duties to the limited partners.  Under Section 7.9(b) of the LP Agreement, the General Partner has a duty to manage the affairs of the Partnership by undertaking actions in "good faith," which the LP Agreement defines to mean "the Person or Persons making such determination or taking or declining to take such other action must reasonably believe that the determination or other action is in the best interests of the Partnership[.]"  Under governing Delaware Supreme Court guidance on language almost identical to the Limited Partnership agreement, this imposes a "contractual fiduciary standard similar if not identical to entire fairness." *Brinckerhoff v. Enbridge Energy Co., Inc.*, 159 A.3d 242, 262 (Del. 2017).

37.     On July 3, 2018, Brookfield became the controller of the General Partner when it acquired a 51% stake in it and the right to appoint seven out of the nine directors of the Board.  As of May 2019, Brookfield owned 100% of the General Partner.  Under Delaware law, the controller of a general partner also owes fiduciary duties to the limited partners when the controller directs the general partner in actions that affect the limited partners.  Because of Brookfield's control and direction of the Teekay GP, it owes the same fiduciary duties, as articulated in the GP and LP Agreements, as Teekay GP and its directors.

38.     The constraints of fiduciary duties can prevent the General Partner from engaging in certain transactions.  But the LP Agreement provides for a way for the General Partner to cleanse potential conflicts and engage in transactions without regard to fiduciary duties, if it seeks, under Section 7.9(a): (i) "Special Approval," *i.e.*, approval of the Conflicts Committee; (ii) approval by

a majority of the units that are not held by the General Partner or its affiliates; (iii) "on terms no less favorable to the Partnership than those generally being provided to or available from unrelated third parties" or (iv) "fair and reasonable to the Partnership, taking into account the totality of the relationships between the parties involved[.]"

39.     The "Conflicts Committee" is defined by Section 1.1 of the LP Agreement as "a committee of the Board of Directors of the General Partner composed entirely of two or more directors who are not (a) security holders, officers or employees of the General Partner, (b) officers, directors or employees of any Affiliate [*e.g.*, Brookfield] of the General Partner or (c) holders of any ownership interest in the Partnership Group other than Common Units and who also meet the independence standards required of directors who serve on an audit committee of a board of directors established by the Securities Exchange Act of 1934, as amended, and the rules and regulations of the Commission thereunder and by the New York Stock Exchange."

40.     Aside from the conflicts cleansing mechanism, the General Partner also has a call right  under Section 15(a) of the LP Agreement: when it or its affiliates hold more than 80% of the Limited Partnership units, it shall have the right to purchase all (but not less than all) the remaining Limited Partnership units at the greater of "the Current Market Price as of the date three days prior to the date" of notice to limited partners or "the highest price paid by the General Partner or any of its affiliates for any such Limited Partner[ship units]. . . purchased during the 90-day period preceding the date" of notice.

41.     Limited Partners have almost no voting rights under the LP Agreement.  As the 20-F points out, holders of 20% or more of any units ***other than*** the General Partner, its affiliates, its transferees, or persons who acquired units with the approval of the General Partner's board, cannot vote on any matter.  Given that the General Partner is entirely controlled by Brookfield, this means

that any unitholder other than Brookfield who is able to acquire a stake of 20% or more of Teekay would have no voice anyway because it would not be able to vote its units.

42.     One exception is that Limited Partners have a right to vote on a merger between the Partnership and another entity.  Section 14.3(b) of the LP Agreement requires a merger to be approved by "the affirmative vote or consent of the holders of a Unit Majority."  However, Section 14.3(e) allows the General Partner to merge Teekay into another company "without Limited Partner approval" given certain conditions, such as when "the Partnership is the Surviving Business Entity in such merger and consolidation."  Furthermore, according to Section 14.2, a merger "requires the prior consent of the General Partner," who "may decline to do so free of any fiduciary duty or obligation[.]"

## SUBSTANTIVE ALLEGATIONS

### A.     Teekay's Fundamentally Strong Business Was Beset by Mismanagement

43.     Teekay was founded in 2006 as a spin-off of the Corporation, which until 2017 also held the majority or all the interest in the Teekay GP.  Teekay initially found success as the international oil market boomed, with its stock price peaking at $42.31 on June 9, 2006.  As recently as June 27, 2014, it traded at $36.50.

44.     The business has strong fundamentals.  As Brookfield highlighted when it initially invested in Teekay, by 2017, Teekay had "consolidated assets of $5.6 billion and its fleet of 62 offshore vessels provides critical services to its customers."  Furthermore, Brookfield listed the following as Teekay's "Business Highlights:

- Annual Adjusted EBITDA of approximately $590 million[;]

- Average contract duration of 4 years with strong prospects for contract extensions[;]

- Strong relationships with global exploration and production companies[;]

11

- Control of approximately 40% of the world's shuttle tanker fleet, specialized vessels that transport crude oil and condensates from offshore production sites to onshore terminals and refineries[;]

- The world's fourth largest portfolio of FPSO units (floating production, storage and offloading) which Teekay Offshore leases to global exploration and production companies in the North Sea and Brazil[; and]

- A diversified portfolio of high-quality FSO units (floating storage and offloading) and high-spec, long distance towage vessels."

45.     Brookfield further highlighted:

Teekay Offshore has a substantial portfolio of medium to long-term, fixed-rate contracts with high quality, primarily investment grade counterparties. The existing portfolio is comprised of several growth projects in late stages of completion which are expected to provide significant near and longer-term cash flow growth.  As a fee-based business focused on critical transportation and production services, Teekay Offshore has limited direct commodity exposure.

46.     Moreover, Teekay benefits from high barriers to entry.  The business requires expensive capital investment in tankers and other infrastructure that can cost between $50 million to $250 million to acquire, and can cost more than $2 billion to build.  Because of the small circle of international petroleum producers, deep-seated relationships with transportation service providers are key, and Teekay has long established these relationships.

47.     Despite its strong fundamentals, around June 2014, Teekay's performance took a dip and its stock price dramatically declined by over 90% over three years.  The trigger for the poor performance was a decrease in oil prices, which fell by 72% over 2014 to 2016, and an increase in competition, especially from the increase in oil production from the United States owing to shale fracking.  Moreover, Teekay suffered from poor management and capital allocation.

The then sole controller of its General Partner, the Corporation, siphoned what profits Teekay had through the General Partner's incentive distribution rights ("IDRs"), which gave the Corporation misaligned incentives because IDRs increased as a percentage the larger the dividend was – from a 2% fee if dividends were $0 to $0.40 per share, to 15% if dividends were up to $0.44 per share, to 25% if dividends were up to $0.53 per share, and 50% if dividends were above $0.53 per share. This led the Corporation to focus on growing the dividend up to 21% to 22% as a percentage of sales, which led to an increasing cash deficit of $819 million by 2017.  Moreover, Teekay was focused on growth even at the expense of paying down existing debt, which is contrary to the typical way in which its industry operates.  Without the cash to cover its operating deficit, Teekay instead relied on selling equity and higher risk debt to fund its growth commitments, adding up to more than $5 billion in capital obligations.

48.    The decrease in performance led to a dramatic decline in Teekay's common units' trading price, which by June 2017 only traded at a little above $2 per unit.  Teekay's dramatic decline in market capitalization and profitability, coupled with its increase in debt, led to a serious cash crunch.

**B.    Brookfield Rode to the Rescue as a White Knight and Gained Negative Control of Teekay**

49.    In this time of crisis, Teekay received a white-knight offer from Brookfield.  At the time, Brookfield appeared to be an ideal partner because of its experience managing energy companies such as natural gas storage and transportation assets in the United States and Brazil.

50.    In June 2017, Brookfield announced it would invest $750 million into Teekay.  At the time, Teekay's trading price was at $2.43 as of the close of June 26, 2017.  Brookfield bought the units at $2.50 when Teekay and Brookfield announced the investment on June 27, 2017; Teekay's trading price closed at $2.56 on that day.  The transaction closed on September 25, 2017.

51.     Brookfield's investment infused Teekay with capital and strengthened its balance sheet.  In return, Brookfield got 49% ownership of the General Partner and an option to purchase another 2% of the General Partner, while the Corporation retained a majority stake.  Brookfield also gained the right to elect four out of the nine directors of the General Partner's Board.   In addition, Brookfield became the majority owner of the Limited Partnership, acquiring a stake of 60% of the common units through a new equity issuance that diluted existing common unitholders, as well as 65.5 million warrants that had a strike price of $4 per unit.  Because these warrants could not be exercised unless the Teekay units gained appreciably in value, many significant investors were confident Brookfield was signaling it would invest in Teekay for the long term so that it could bring the common unit trading price up.

52.     Even though Brookfield initially held 49% of the interest in Teekay GP and elected four out of its nine directors, Brookfield had negotiated veto rights that gave it negative control of Teekay, including requiring Brookfield's consent for the Partnership to: (a) authorize, split, or reclassify equity securities; (b) incur debt of greater than $50 million; (c) amend corporate policies or organizational documents; (d) enter into a transaction with an affiliate for over $1 million; (e) enter an acquisition, divestment, or capital investment of more than $50 million; (f) commence or settle litigation of over $5 million; (g) enter into a transaction that would require the approval of the common unitholders; (h) change the size of the General Partner board; (i) make material changes to the employment of officers; (j) effect a material change in the nature of the business or operations; (k) approve a business plan or budget that would increase annual expenditures of more than 5%; (l) declare or pay a dividend of above 1 cent; and (m) redeem, purchase, or otherwise acquire equity securities of the general or limited partnership.

53.     Brookfield conditioned its investment on an immediate cut of Teekay's dividend to its common units to $0.01 per unit from $0.11 per unit.  While, ostensibly, this move was supposedly meant to give Teekay more cash to reinvest in its business, this also had the counterproductive effect of leading to 40% of Teekay's institutional investors pulling out since the value proposition for them of investing in Teekay was its high dividend yield.

54.     Brookfield's investment allowed Teekay to repurchase and cancel $304 million worth of Series C-1 and Series D preferred units for approximately $250 million in cash, which saved approximately $28 million in annual distributions.  Teekay was also able to refinance approximately $1 billion worth of debt.  But at the same time, rather than focus on paying down Teekay's debt further and focusing on growing existing assets' net cash flow, Brookfield caused Teekay to take on new debt to finance growth projects that would generate cash flow in the long term but cause pain in the short term because of their costs.  A conditional order for two shuttle tanker newbuildings was announced on July 27, 2017, along with Brookfield's investment in Teekay.  After Brookfield's investment in Teekay closed in September 2017, the shuttle tanker order was finalized on November 28, 2017 at a cost of $265 million.  But Teekay's decision to focus on growth without first paying off its existing debt also created doubt in the marketplace, where some investors were skeptical Teekay could actually pay off its debt, which kept the trading price of the common units depressed.

55.     Brookfield further used this negative control to steer Teekay toward actions that directly benefited Brookfield.  When Teekay's then-CFO announced his departure in March 2018, Brookfield replaced him with a BAM senior vice president.  And rather than allow Teekay to acquire debt that it needed to finance its operations from other sources, Brookfield steered it toward acquiring debt from Brookfield.  On March 31, 2018, Teekay entered a credit agreement for an

unsecured revolving credit facility provided by the Corporation ($25 million) and Brookfield (for $100 million) that was fully drawn by December 31, 2018. In June 2018, Teekay announced that it would issue a private placement of $500 million in unsecured notes. But less than a month later, in late June 2018, Brookfield caused Teekay to announce that it would upsize its offering for Brookfield's benefit by $200 million. On July 2, 2018, Teekay issued a private placement of $700 million; this included selling $500 million of debt to Brookfield but also repurchasing a $200 million promissory note from Brookfield from September 25, 2017, which means Brookfield paid itself back in 2018 for its investment in 2017 ahead of other debtholders. Brookfield had itself paid only $140 million for the $200 million promissory note, and Teekay paid Brookfield a $12 million early termination fee, so Teekay's repurchase of the note allowed Brookfield to net $72 million.

56.     While some of the decisions Brookfield directed Teekay to make were controversial, many other investors initially saw Brookfield's investment as a godsend. For example, institutional investor JDP Capital Management ("JDP") credited Brookfield with "re-capitaliz[ing]" a "mission-critical marine infrastructure business[.]" JDP evaluated Teekay as having a "[w]orld-class marine infrastructure asset portfolio" with "unique assets." The infrastructure assets Teekay has are infrastructure assets formerly owned by oil companies, which are "[m]ission-critical components to offshore drilling." Moreover, Teekay's business model resulted in predictable cash flows because of long-term contracts and finance terms that protect against cancellations, and high barriers to entry that protected it against competition.

### C.     Brookfield Gained Control and Took Actions that Depressed the Stock Price

57.     On July 3, 2018, Brookfield exercised its option to purchase 2% of the units, and became the controlling unitholder of the General Partnership with a 51% stake, with the right to

elect seven out of the nine directors of the Board.  Because the General Partner has the authority to undertake almost every operational action without the Limited Partners' approval, including the distribution of dividends, Brookfield gained affirmative control of Teekay through its majority holding in the General Partner.  Around the same time, Brookfield caused the General Partner through its Board to take several actions that it misled the public stockholders into thinking were legitimate business decisions but, in reality, were meant to depress the unitholders' stock value so that Brookfield could be in a position to buy up the units for cheap.

58.    Brookfield's exercise of its option caused a Change in Control event that required Teekay to offer to repurchase debt that was originally due by 2019; instead, by July 11, 2019, Teekay was forced to buy back more than $222 million of debt from a $300 million note offering.

59.    Brookfield also caused Teekay to distribute dividends to preferred shares in July 2018 and in April 2019 of approximately $0.45 to $0.55 per share.  At the same time, on January 8, 2019, the General Partner, controlled by Brookfield, announced that Teekay would cut its dividend to common unitholders from $0.01 per share to zero.  Ostensibly, the reason was to strengthen Teekay's balance sheet and reinvest in the business.  But this cut in dividends for common units while distributing generous dividends to preferred unitholders also had the effect of keeping the common unit trading price depressed because it drove away institutional investors seeking the investment for high yields.

60.    Brookfield also caused Teekay to acquire debt for expensive capital intensive projects.  Teekay had substantial debt, which totaled $3.1 billion as of December 31, 2018. Teekay's high levels of debt meant that its net cash flow remained negative.  In 2018, while it generated $281 million of cash flow, it had a working capital deficit of $488 million as of December 31, 2018 because of its high debt levels and repayment needs.

61.     Even so, Teekay "[p]lanned to increase [its] total debt relating to [its] shuttle tanker newbuildings and on [its] under-levered and unmortgaged vessels.  But Brookfield also gave the market some confidence, when in early 2019, it announced it had secured $414 million of financing for its shuttle tanker newbuildings and $100 million in refinancing for its FPSO units. Nevertheless, this increased debt has temporarily depressed cash flows and fueled concern in the market regarding Teekay's debt level, which has depressed the trading price of Teekay's common units.  But the shuttle tankers are expected to begin to generate cash flow when they are delivered throughout late 2019 or early 2020, so existing investors thought Teekay's depression in value would be temporary and that they would soon benefit from the upside to be realized in the near term.

62.     Moreover, Brookfield cemented its control over the Board by securing control of the Corporate Governance Committee ("CGC"), which, *inter alia*: (1) reviews the size, structure, and compensation of the Board and its committees; (2) reviews the appropriateness of restrictions on board service, such as term limits or a retirement policy; (3) recommends the filling of vacancies and chairs; and (4) oversee annual evaluations of directors.

63.     But as its charter acknowledges, the CGC is not required to be comprised of independent members.   In September 2018, Brookfield appointed two BAM executives, Defendants Turcotte and Laurie, to the Board and staffed them on the CGC, which was chaired by Defendant Utt.  By stacking the CGC with loyalists, and through the CGC's control of director evaluations, compensation, terms of service, vacancies, and leadership positions, Brookfield cemented its control over the Board as a whole.

64.     But investors continued to believe in Brookfield's investment and in Teekay's prospects.   JDP, for example, published an October 2018 update to its earlier presentation

highlighting Brookfield's positive impact on Teekay, stating that Brookfield's initial investment was an "incredible deal," as it "repaired" Teekay's balance sheet just in time for the "[e]arly stages of a major sector rebound."  Moreover, JDP highlighted the "[p]redictable revenue and margins driven by long-term lease contracts" with an average margin of 39% between 2007 to 2018, and noted that Teekay's "[u]nderlying free cash flow is stable and growing."  JDP acknowledged that the cash flow was "temporarily depressed" because of certain temporary costs including "[s]ignificant Brookfield re-financing and high transaction fees."  But at the same time, JDP recognized that "[r]ecent contract awards lock in additional growth."  Because of Teekay's strong fundamentals and potential, JDP estimated that despite the fact that Teekay traded around $2.10 per unit, it was actually worth more than twice as much.

65.     Meanwhile, Brookfield used its control of the General Partner to have Teekay continue to issue encouraging statements about its investments.  Defendant Saether, Teekay's CEO, as recently as March 6, 2019, told investors about the great prospects in the business.  In a presentation to investors, Teekay highlighted how "Brookfield brings significant access to capital and a global platform."  It highlighted Brookfield's investment of $1.5 billion in debt and equity over the last year and a half.  The presentation also emphasized Teekay's "Robust Underlying Business," including $5.7 billion in "Forward Revenue" and "steady cash flows despite market downturn and oil price volatility" and an increase in adjusted EBITDA of $783 million in 2018 that increased from $261 million in 2017.  Moreover, the presentation promised a "Recovery Underway in [Teekay's] Core Markets" through "Strong Growth in Deep Water Production" driving "Demand for FPSOs and shuttle tankers."  Teekay also completed several "Growth Projects" so that it was in a good place to meet the demand.

66.     The strong fundamentals in the business, the prospect that debt-financed projects such as new shuttle tankers will begin to generate healthy cash by late 2019 or early 2020, and Brookfield's seeming encouragement through infusing Teekay with capital have led to several major investors valuing Teekay far above its common units' trading price.  JDP, for instance, offered a valuation of between $2.53 to $9.55 per unit.  Noster Capital LLP believes the common units would be worth $5.61 by 2022.  Plaintiff Monosson pegged the valuation at between $2.25 to $7.08 per unit.  Thus, despite Teekay's low trading price, zero dividend, and high debt load, numerous large investors have continued to hold significant stakes in the company because they believed that the strong fundamentals and potential of the business would allow investors to see a significant upside in the near future.

### D.     Brookfield Revealed Its True Colors by Squeezing Out the Corporation and Is Currently Attempting to Squeeze Out the Common Unitholders

67.     But public institutional investors' hopes were dashed when Brookfield in the last few months made it clear that it wants to capture all of Teekay's value for itself by squeezing out both the Corporation and the public unitholders at the lowest possible price.

68.     In April 2019, Brookfield bought out all of the Corporation's interests in the General Partner and Teekay for a vastly discounted price.  Brookfield was able to negotiate this deal because it is in part responsible for creating a financial crisis at the Corporation.  Brookfield had used its control of Teekay to eliminate the dividend for common unitholders.  The Corporation, which held 13% of the Teekay common units, was already facing a cash crunch, with financial obligations coming due in summer 2019.  Having already received dramatically reduced dividend payments from mid-2017 through 2018, when Brookfield's investment was conditioned on slashing Teekay's common unit dividends from $0.11 per unit to $0.01 per unit, the Corporation was devastated by the elimination of the dividend altogether.  Brookfield then offered to buy out

all the Corporation's interests in the General Partner and in Teekay (including common units and warrants) for a combined price of $100 million: this was a severe discount because it resulted in an effective price of only $1.05 per unit, which was below the trading price for Teekay common units.  The Corporation had little choice because of the liquidity crisis it faced that Brookfield in part created, and thus had to sell all its interests for this sharply discounted price.

69.     Brookfield's purchase of the Corporation's interests gave Brookfield 100% ownership of the General Partnership interests.  More importantly, Brookfield was able to increase its stake of the Limited Partnership common units from 60% to 73%.  Brookfield also used its effective purchasing price of $1.05 per share of the Corporation's interests to justify an offer to the Conflicts Committee of the same amount to buy out all the remaining limited partner units, despite the fact that this was at a discount from Teekay's trading price of $1.16 per share on May 17, 2019, the date of Teekay's offer.  Moreover, by purchasing a significant number of the total float of Teekay common units at a discount, Brookfield depressed the trading price of the remaining Teekay common units.  In the two and a half months since Brookfield made its offer, Teekay's trading price has always exceeded Brookfield's offer.  Moreover, Teekay's 52-week high was $2.62 per unit.  The offer is less than half of what Brookfield itself paid, which was $2.50 per unit, in June 2017.

70.     It became clear at this point that Brookfield's actions, which had initially been encouraged by common unitholders, were actually designed to depress the valuation of Teekay and drive down its common units' trading price.  Brookfield's issuance of debt to Teekay, for example, initially seen as recapitalizing Teekay, actually also served the purpose of adding to Teekay's debt load. Brookfield causing Teekay to initiate growth projects also increased the expenses without increasing revenues in the short run.  And Brookfield causing Teekay to

eliminate dividends on common units further drove out the old base of high-yield investors. All of these actions have suppressed Teekay's trading price.

> **E.     The Individual Defendants Are Informed of the Common Unitholders' Protests**

71.     Numerous institutional stockholders have protested Brookfield's offer, noting how not only is it lower than Teekay's trading price, but it is multiples lower than its own independent valuations, which range from $2.25 per share to $9.55 per share.

72.     Plaintiff Monosson personally sent a letter on May 21, 2019 to Messrs. Craig, Lemmon, and Transier, the then-members of the Conflicts Committee, to protest against the $1.05 offer by Teekay.

73.     In addition, JDP also sent a letter to the Conflicts Committee with a copy to the other Individual Defendants, protesting the low offer. Noster Capital sent a similar letter to certain officers of Brookfield, including Defendant Madon. Thus, there is no question that the Individual Defendants are aware of strong opposition from the minority unitholders toward this offer.

> **F.     The Conflicts Committee Provides No Meaningful Protection for Common Unitholders**

74.     The Conflicts Committee itself does not consist of entirely independent directors, which renders the process of using the Committee meaningless. When Brookfield sent its original offer, Defendant Transier was a member of the Committee, and had been appointed to the Board only two months earlier. But Transier was also a director of Westinghouse, a Brookfield affiliate, and furthermore worked with Brookfield on the Westinghouse restructuring. Although Transier is as of the date of this action not listed as a member of the Committee, his earlier involvement during the start of the Committee's deliberations and his input in the Committee's choice of advisors infects the process.

75.     The Conflicts Committee's choice of advisors is problematic because these advisors have worked alongside Brookfield or its affiliates in previous transactions.  Evercore Inc. ("Evercore"), the Committee's choice for its financial advisor, for example, was Kinder Morgan's advisor when Kinder Morgan and Brookfield joined forces to acquire Myria Holdings Inc.'s majority interest in Natural Gas Pipeline Company of America LLC in a transaction worth $242 million.  The Conflicts Committee retained legal counsel, Potter Anderson & Corroon LLP ("Potter Anderson"), which had already represented the Conflicts Committee when it considered Brookfield's initial 2017 investment in Teekay.  Moreover, Potter Anderson was also counsel to individual defendants in *In re Rouse Properties, Inc. Fiduciary Litigation*, C.A. No. 12194-VCS (Del. Ch.), where BAM and affiliated entities were also defendants.

76.     Furthermore, the Conflicts Committee process is tainted by the fact that Brookfield has already laid the groundwork by driving down the trading price of Teekay's common units, and has positioned Brookfield to be able to rapidly acquire enough shares on the public market to exercise its call right. Brookfield already owns 73% of the common units.  Brookfield would then only need to purchase another 7% on the open market to trigger its call right to buy out the rest of Teekay's common units.  Thus, the low trading price creates a ceiling on how much of a premium the Conflicts Committee can negotiate.

### G.     Brookfield, in Violation of Its Fiduciary Duties, Has Set Up a Perfect Method for Bulldozing the Common Unitholders

77.     Brookfield's stated intention is to effect the purchase of all common units through a merger to be approved by the Conflicts Committee.  Once the Conflicts Committee approves Brookfield's proposal and thus grants it "Special Approval," the Limited Partners will have no meaningful way to resist a merger agreement at an unfair below-market price.  The merger procedure in the LP Agreement provides for clear sailing by Brookfield.  Section 14.3(b), which

requires the vote of an affirmative majority of the Limited Partnership common units, would lead to a foregone conclusion because Brookfield already holds a majority of the Limited Partnership common units. Moreover, Brookfield can bypass a vote by the Limited Partners because it plans to structure the merger to have Teekay "surviv[e] the merger as a wholly-owned subsidiary of the Brookfield Consortium." Under Section 14.3(e), the General Partner – which Brookfield controls – can approve a merger without putting it to a vote to the Limited Partners where the Partnership is the surviving entity. Moreover, under Section 14.2, because the General Partner's consent is required for any merger, and because Brookfield controls the General Partner, Brookfield can simply cause the General Partner to reject any alternative deals and bully the Conflicts Committee into accepting its offer.

78.     Brookfield chose the bullet-proof method of a Special Approval, with the background threat that it can rapidly buy up enough units on the open market so it can exercise its call right. Thus, Brookfield is assured – one way of another – of buying up the Limited Partner units at either the depressed price on the market or the further-depressed price based on its unfair offer to the Conflicts Committee. But Brookfield did not choose to submit its offer to a vote by non-affiliated unitholders because its absurdly low offer at under Teekay's trading price would be rejected. Brookfield has instead chosen to deny non-affiliated unitholders a voice.

79.     Brookfield and Defendants' bulldozing of non-affiliated Teekay unitholders through its low-ball offer manifestly violates their fiduciary duties under the LP Agreement. Owing to the "good faith" standard in the LP Agreement being based on what the General Partner "reasonably believe[s]" to be the Partnership's best interests, the transaction would have to be entirely fair. This is manifestly not the case as Brookfield is offering a price that is so low that every public valuation by non-affiliated unitholders placed Teekay's value higher and Teekay's

trading price has also consistently traded above Brookfield's offer.  Moreover, the process is rife with conflicts.  Brookfield stands on both sides of the transaction.  Brookfield has also stacked the Board with its loyalists: five out of the nine are current or recent employees of BAM, and Brookfield's control of the CGC, which evaluates and recommends the compensation for the entire Board, ensures all the directors will stay in line.  And Brookfield has caused the General Partner to undertake numerous actions that have had the effect of depressing the stock price in the time period since Brookfield took control.  Finally, Brookfield has infected the Conflicts Committee by placing a non-independent director on it, thus causing the Conflicts Committee to select conflicted advisors.

80.    Brookfield's low-ball offer is harmful to the Class in a way different from its status as a controlling unitholder.  Thus, the Class has a right to assert these claims against Brookfield directly.  The differential effect on the public unitholders consists of: (1) the common unitholders are being offered consideration by Brookfield that Brookfield itself is not partaking in; (2) the common unitholders will have no potential for any upside if Brookfield buys up all the units and takes the company private; and (3) the common unitholders will lose all their rights as unitholders once they are bought out by Brookfield but Brookfield retains its rights because it will hold all the units.

## CLASS ALLEGATIONS

81.    Plaintiffs bring this action as a class action under Rule 23 of the Federal Rules of Civil Procedure on behalf of themselves and all other holders of the common units of the Limited Partnership, except for those units held by Defendants or their affiliates, as of June 27, 2017 (the "Class").

82.     The action is properly maintainable as a class action because it fulfills the requirements of Rule 23(a) and (b)(1), (b)(2), and (b)(3).

83.     The Class is so numerous that joinder of all members is impracticable, because there are approximately 109 million units in the Class, held by numerous entities and persons.

84.     The Class faces common issues of fact and law, including:

a.     whether Defendants have breached their contractual fiduciary duties to the Limited Partnership and the Common Unitholders;

b.     whether Defendants have breached the LP Agreement;

c.     whether Plaintiffs and Class members have suffered harm as a result;

d.     whether Plaintiffs and Class members are entitled to injunctive relief; and

e.     whether Plaintiffs are entitled to damages if the proposed transaction goes through at an unfair price.

85.     Plaintiffs' claims are typical of the Class because they have the same claims as other Class members, and Plaintiffs' claims arise from the same course of conduct as other Class members'.

86.     Plaintiffs are adequate Class representatives because they are committed to prosecuting this action, have retained competent counsel experienced in prosecuting these types of litigation, and neither Plaintiffs nor their counsel have any conflicts of interest with respect to other Class members.

87.     Moreover, this action should be prosecuted as a class action because the prosecution of separate actions by individual members would create a risk of inconsistent or varying adjudications that would establish incompatible standards of conduct for Defendants.

88.     Prosecution of this action as separate individual actions would also be dispositive of the interests of individual unitholders who are not parties to these adjudications and therefore would substantially impair or impede their ability to protect their interests.

89.     Furthermore, Defendants have acted or refused to act on grounds generally applicable to the Class as a whole, with respect to the matters alleged in this Complaint.

90.     Furthermore, common issues of fact and law predominate over individual issues of the class, and a class action is superior to other methods available for the fair and efficient adjudication of this controversy because the expense and burden of individual litigation would make it impracticable for Class members to seek individual redress.

## COUNT I

### Against All Defendants for Breach of Fiduciary Duties

91.     Plaintiffs incorporate by reference and reallege each and every allegation set forth above as though fully set forth herein.

92.     Defendants owe fiduciary duties to the Partnership and the Limited Partners because:

a.     The GP Agreement states that Directors have fiduciary duties to the Partnership;

b.     The LP Agreement, through its "good faith" standard based on "reasonabl[e] belie[f]" enacts a contractual fiduciary duty standard for the General Partner and its Board to act in the best interests of the Class; and

c.     The controller of the General Partner has the same fiduciary duties of the General Partner because it directed the General Partner to undertake the actions at issue in this case.

93.     Defendants have breached their fiduciary duties by undertaking actions, or acquiescing in actions, that suppressed and continue to suppress the value of the common units, through offering and considering the offer to buy out those units at a grossly unfair price, and through running an unfair process rife with conflicts to consider the offer; and

94.     Plaintiffs and the Class suffered and are suffering damages as a direct and proximate result of Defendants' breach of fiduciary duties.

## COUNT II

### Against All Defendants for Breach of Contract for Failing to Act in Good Faith Pursuant to Section 7.9(b) of the LP Agreement

95.     Plaintiffs incorporate by reference and reallege each and every allegation set forth above as though fully set forth herein.

96.     Under Section 7.9(b) of the Partnership Agreement, the General Partner and its directors and affiliates owe duties to act or cause the General Partner to act in good faith, which is defined as what the General Partner its directors and affiliates reasonably believe to be in the best interests of the Partnership.

97.     But by undertaking actions that suppressed Teekay's common unit price, and by offering a grossly unfair price or considering an unfair offer, Defendants have failed to act in good faith.

98.     This failure breached section 7.9(b) of the LP Agreement.

99.     Plaintiffs and the Class suffered and are suffering damages as a direct and proximate result of Defendants' breach of contract.

## COUNT III

### Against All Defendants for Breach of Implied Covenant
### of Good Faith and Fair Dealing

100.    Plaintiffs incorporate by reference and reallege each and every allegation set forth above as though fully set forth herein.

101.    Every contract has an implied covenant of good faith and fair dealing that cannot be contracted away.

102.    Defendants are bound to perform their obligations in good faith and not take any actions that would deprive Plaintiffs of the benefit of their bargain under the LP Agreement.

103.    But by taking actions that suppressed the common unit price and by offering or considering an offer to buy out these units at a grossly unfair price, Defendants have deprived and are depriving Plaintiffs of the benefit of their bargain through causing the value of Plaintiffs' units to sink.

104.    Defendants have therefore breached the implied covenant of good faith and fair dealing.

105.    Plaintiffs and the Class suffered and are suffering damages as a direct and proximate result of Defendants' breach of contract.

## COUNT IV

### In the Alternative, Against Brookfield, Aiding and
### Abetting Breach of Fiduciary Duties

106.    Plaintiffs incorporate by reference and reallege each and every allegation set forth above as though fully set forth herein.

107.    The Individual Defendants have fiduciary duties toward the Partnership because:

a.      The GP Agreement states that Directors have fiduciary duties to the Partnership; and

b.      The LP Agreement, through its "good faith" standard based on "reasonabl[e] belie[f]" enacts a contractual fiduciary duty standard for the General Partner and its Board obligating them to act in the best interests of the Class.

108.   Defendants have breached their fiduciary duties by undertaking actions, or acquiescing in actions, that suppressed and continue to suppress the value of the common units, through offering and considering the offer to buy out those units at a grossly unfair price, and through running an unfair process rife with conflicts to consider the offer.

109.   Plaintiffs and the Class suffered and are suffering damages as a direct and proximate result of Defendants' breach of fiduciary duties.

110.   By inducing the Individual Defendants to take the above-referenced wrongful actions, Brookfield knowingly participated in Individual Defendants' breach of fiduciary duty.

111.   As a result, Brookfield aided and abetted Individual Defendants in the breach of their fiduciary duties.

## <u>COUNT V</u>

### <u>In the Alternative, Against Brookfield for Tortious Interference</u>

112.   Plaintiffs incorporate by reference and reallege each and every allegation set forth above as though fully set forth herein.

113.   Brookfield knew of the existence of the LP Agreement and the Partnership's relationship to common unitholders.

114.   Brookfield, therefore, knew that the Individual Defendants were required to act in good faith toward the Partnership and the Class.

115.    But Brookfield used its control over the GP and the Partnership to cause Individual Defendants to act in bad faith, by causing them to undertake actions that suppress the value of the common units, and by making Individual Defendants consider their offer to buy out the Class at a grossly unfair price.

116.    Plaintiffs and the Class have been injured by being deprived of the benefit of their bargain in an amount to be determined at trial.

117.    As a result, Brookfield has tortuously interfered with the LP Agreement.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that the Court:

A.    Declare that this action is properly maintainable as a class action;

B.    Declare that Defendants breached their fiduciary duties to the Class;

C.    Declare that Defendants breached the LP Agreement;

D.    Enjoin the merger of Teekay into a Brookfield entity;

E.    In the alternate, ordering the merger to be conditioned on approval by a majority of the non-Brookfield-affiliated Teekay common units;

F.    In the event the merger is completed at an unfair price, rescind the merger or award Plaintiffs and the Class rescissory damages;

G.    Awarding the costs and expenses, including reasonable attorneys' fees, incurred in the prosecution of this action; and

H.    Granting such other and further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiffs hereby demand a trial by jury.

DATED: August 12, 2019

**SCOTT+SCOTT ATTORNEYS AT LAW LLP**

/s Thomas L. Laughlin, IV
Thomas L. Laughlin, IV
Jing-Li Yu
The Helmsley Building
230 Park Avenue, 17th Floor
New York, New York 10169
Telephone: (212) 223-6444
Facsimile:  (212) 223-6334
tlaughlin@scott-scott.com
jyu@scott-scott.com

Geoffrey M. Johnson
**SCOTT+SCOTT ATTORNEYS AT LAW LLP**
12434 Cedar Road, Suite 12
Cleveland Heights, OH 44106
Telephone: (216) 229-6088
Facsimile:  (860) 537-4432
gjohnson@scott-scott.com

*Counsel for Plaintiffs*

## VERIFICATION OF STEVEN A. MONOSSON

I, Steven A. Monosson, being duly sworn, depose and say:

I am a plaintiff in *Monosson v. Teekay Offshore Partners L.P.*   I verify that I have reviewed the Verified Class Action Complaint for Breach of Fiduciary Duties and Breach of Contract (the "Complaint") to be filed in this action and that the facts stated in the Complaint, as they concern me, are true to my personal knowledge.   I believe the facts pleaded in the Complaint on information and belief or investigation of counsel are true.

I have not received, been promised or offered, and will not accept, any form of compensation, directly or indirectly, for prosecuting this action of serving as a representative party in this action except (i) such fees, costs or other payments as the Court expressly approves to be paid to Plaintiffs, or (ii) reimbursement, by its attorneys, of actual and reasonable out-of-pocket expenditures directly in connection with the prosecution of this action.

Dated:___8/9/19___

_____
STEVEN A. MONOSSON

Sworn and subscribed before me this _____ day of August 2019.

_____
NOTARY PUBLIC

SHRUTI BHALLA
COMM # 2289047
NOTARY PUBLIC - CALIFORNIA
SAN MATEO COUNTY

My commission expires:

___Jun 8 2023___

## VERIFICATION OF MARK WHITING

I, Mark Whiting, being duly sworn, depose and say:

I am a plaintiff in *Monosson v. Teekay Offshore Partners L.P.*  I verify that I have reviewed the Verified Class Action Complaint for Breach of Fiduciary Duties and Breach of Contract (the "Complaint") to be filed in this action and that the facts stated in the Complaint, as they concern me, are true to my personal knowledge.  I believe the facts pleaded in the Complaint on information and belief or investigation of counsel are true.

I have not received, been promised or offered, and will not accept, any form of compensation, directly or indirectly, for prosecuting this action of serving as a representative party in this action except (i) such fees, costs or other payments as the Court expressly approves to be paid to Plaintiffs, or (ii) reimbursement, by its attorneys, of actual and reasonable out-of-pocket expenditures directly in connection with the prosecution of this action.

Dated: ___August 8, 2019___                    _____
                                                                              MARK WHITING

Sworn and subscribed before me this ___8___ day of August 2019.

                                                                     _____
                                                                         NOTARY PUBLIC

My commission expires:

___10/1/2021___



JANET G. BEVERLY
Notary Public – California
San Francisco County
Commission # 2212775
My Comm. Expires Oct 1, 2021